**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| Philips North America LLC, a Delaware company,<br><br>Plaintiff,<br><br>vs.<br><br>John W. Jordan, II a/k/a Jay Jordan, Reagan P. Hogerty, and JHP Management Inc., a Delaware company<br><br>Defendants. | Case No.: 26-12494<br><br><br>JURY TRIAL DEMANDED |

# COMPLAINT

Plaintiff Philips North America LLC ("Plaintiff" or "Philips"), by and through its undersigned counsel, hereby brings the following Complaint against John W. Jordan, II a/k/a Jay Jordan ("Jordan"), Reagan P. Hogerty ("Hogerty") and JHP Management, Inc. ("JHP Management") (collectively, "Defendants") and now plead as follows:

## OVERVIEW

1. Philips is a well-known leader in the business of developing, manufacturing, selling, supporting, maintaining, and servicing medical imaging systems used at hospitals and medical centers. Philips' systems include Philips' proprietary hardware and software, which may be used to operate, service, and repair Philips' systems. Philips' proprietary software enables certain licensed functions on the ultrasound systems and security systems implemented on the systems are designed to prevent purchasers or other users of the systems from making unlicensed

modifications to the software on the systems or accessing unlicensed software. Philips' customers pay to license specific software features and options. Philips accordingly enables licensed features and options.

2. This lawsuit arises from a scheme spearheaded by Jordan and Hogerty to acquire and consolidate companies that used methods to bypass Philips' security and access and use, and enable others to use, unlicensed Philips' software into a family of companies. That family of companies was consolidated under the entity Jordan Health Products, LLC ("Jordan Health Products"), which was rebranded to Avante Health Solutions in or about 2017. The acquired companies collectively possessed methods and tools that were shared between them to bypass security on Philips proprietary medical imaging software and to modify the systems to enable unlicensed software features and obtain unauthorized access to proprietary software tools. After reaping tens of millions of dollars in benefits over the course of several years, Jordan and Hogerty spearheaded a plan to dissipate all of the Jordan Health Products companies' assets and to drive the businesses into bankruptcy in order to limit and obstruct Philips' ability to recover damages by making the operating Jordan Health Products companies (defined below) judgment proof. This included incurring $72,500,000 in loans to undercapitalize the operating Jordan Health Products companies even though they were consistently generating over $100 million in revenue.

3. For nearly a decade, Jordan and Hogerty successfully hid their involvement in the scheme. Jordan and Hogerty claimed they had nothing to do with Jordan Health Products or its operating entities and they hid behind a complex web of entities disavowing any involvement in Jordan Health Products or the operating entities' businesses. It was not until after Jordan Health Products and its affiliated companies filed for bankruptcy in October 2024 (*Jordan Health Products I, Inc.*, Case No. 1:24-bk-12271 (Bankr. D. Del. Oct. 8, 2024) (the "Bankruptcy

Proceeding")) that Philips could start piecing together Jordan and Hogerty's culpable conduct and the role of JHP Management to secretly siphon money from the Jordan Health Product operating companies and funnel it out to Jordan and his businesses, including Jordan Industries, who in turn compensated Hogerty.

4. In April and May 2025, Philips was first able to obtain documents from AHS Acquisition Holdings, LLC ("AHS"), the entity that acquired the operating businesses and their assets out of bankruptcy. These documents revealed that:

(i) Jordan was the lead officer and a board member of Jordan Health Products, JHP Management and each operating entity;

(ii) Jordan had the final say so on all management, personnel and financial decisions of each operating entity, including the payment of attorneys' fees in litigation Philips commenced against the operating entities;

(iii) Jordan had administrative and managerial control of the entities involved in the scheme and acted as the moving force behind their participating in a conspiracy to engage in fraud and build a consolidated family of businesses that operated by using unlawful methods and tools to pirate Philips' proprietary software;

(iv) Hogerty was an officer and board member of Jordan Health Products, JHP Management and each operating entity and acted as Jordan's right hand and boots on the ground manager to directly influence, control and supervise the management of the Jordan Health Products operating companies in concert with Jordan, including litigation strategy, and he had administrative and managerial control of the entities involved in the scheme and acted as the moving force behind their participating in a conspiracy to engage in fraud and build a consolidated family of businesses that operated by using unlawful methods and

tools to pirate Philips' proprietary software, including executing agreements on their behalf;

(v) even though the operating companies generating tens of millions of dollars, Jordan and Hogerty caused Jordan Health Products and the operating entities to enter into a large loan that left the entities undercapitalized, judgment proof and destined for bankruptcy, while personally profiting from the businesses and their unlawful activities;

(vi) JHP Management—an entity controlled by Jordan and Hogerty—managed the operating entities and siphoned money from the operating entities, including more than a million dollars in the 90 days before the operating entities filed for bankruptcy, and, on information and belief, distributed tens of millions of dollars to Jordan, Hogerty and/or entities they owned and controlled or otherwise benefitted from.

5. Philips brings this action against Defendants to hold them accountable for their role in stealing intellectual property from Philips and violating the law and to recover millions of dollars in ill-gotten proceeds. This case is related to the pending action *Philips North America LLC et al. v. Global Medical Imaging, LLC et al.*, Case No. 1:21-cv-03615 (N.D. Ill.) (the "GMI Litigation").

**THE PARTIES**

6. Plaintiff Philips North America LLC is a Delaware limited liability company, formerly known and doing business as Philips North America Corporation (a Delaware Corporation), with a principal place of business in Andover, Massachusetts. Its business includes, among other things, developing, manufacturing, selling, supporting, maintaining, and servicing Philips medical imaging systems.

7. Defendant JHP Management, Inc. is a Delaware corporation that regularly conducts business in this district and has its principal place of business at 875 N. Michigan Avenue, Suite 4020, Chicago, IL 60611.

8. Defendant John W. Jordan II is an individual who regularly conducts business in this district and who on information and belief resides in this district.

9. Defendant Reagan P. Hogerty is an individual who regularly conducts business in this district and who on information and belief resides in this district.

## JURISDICTION AND VENUE

10. This action is for vicarious liability for circumventing a technological measure that effectively controls access to a protected work arising under the Digital Millennium Copyright Act ("DMCA") 17 U.S.C. §§ 1201, 1202 *et seq.*, for civil conspiracy to commit fraud, and for unfair competition.

11. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a), 17 U.S.C. § 100 *et. seq.*, and 28 U.S.C. §1369 (supplemental jurisdiction) and the doctrines of ancillary and pendant jurisdiction.

12. This Court has personal jurisdiction over JHP Management, because JHP Management has its principal place of business located in this district. Moreover, JHP Management has transacted business in this district.

13. This Court has personal jurisdiction over Jordan, because Jordan resides in this district, Jordan has transacted business in this district, and has committed tortious acts within the State of Illinois, and Jordan owns or controls multiple businesses whose principal places of business are located in this district.

14. This Court has personal jurisdiction over Hogerty because Hogerty resides in this district, has transacted business in this district, and has committed tortious acts within the State of Illinois, and owns or controls multiple businesses whose principal place of business is located in this district.

15. Venue is proper within the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b)(1) and (2), because Defendants reside in this district and the asserted claims arise from Defendants' conduct within this district.

## BACKGROUND AND FACTS RELATED TO THIS ACTION

### ~Background Related to Philips~

16. Philips is well-known in the healthcare industry as a trusted provider of electronic medical imaging devices for use in healthcare facilities by healthcare providers.

17. Philips is among the premier medical imaging device companies in the United States and supplies healthcare providers throughout the United States with medical devices. Philips provides a variety of high-quality products that include, but are not limited to, imaging devices such as ultrasound systems, computed tomography (CT) scanners, positron emission tomography (PET) scanners, X-ray machines, nuclear medicine scanners, and magnetic resonance (MR) scanners.

### ~Philips Has Implemented Strict Access Controls to Protect Its Proprietary Software~

18. Philips medical imaging devices are complex pieces of medical equipment that utilize copyright protected, proprietary software and trade secrets that accompany each system. That software was developed by and is owned by Philips entities.

19. The specific versions and functionalities of the software enabled on a particular system can vary, and Philips licenses the use of software features on each specific system. Because

the proprietary software controls what licensable features are available for use and copying into memory on Philips medical imaging devices, the proprietary software includes strict access controls to limit access to software features. These access controls also control access to optional software which enables certain software features and which Philips licenses to end users for a fee.

20. Philips medical imaging devices include both model specific features and machine specific set features that Philips enables on each system pursuant to purchased licenses.

21. Philips uses multiple layers of technological controls to protect Philips' copyright-protected works from unauthorized access. These controls include user-specific access codes and hardware keys, which enable the software access and control features for a particular registered user. These user specific access controls permit access to specific Philips tools and features based on a user's registered access authorization level. These controls also include machine-specific access controls which permit users access only to the features and tools that have been enabled on a specific device. Philips further protects its proprietary software with both contractual restrictions and access controls, which only allow individuals access to informational material consistent with the authorization level of their user credentials.

22. For many Philips systems, such as ultrasound systems, each specific system includes certain software and hardware features that may only be used when a particular licensable feature is enabled. For such systems, when sold from Philips only the licensed features and tools are enabled.

23. Philips' optional licensable features control access to Philips' proprietary software and limit the options available on each specific system. Features and add-ons that have not been licensed are not accessible on Philips medical imaging devices. An attempt to use an unlicensed feature on a Philips medical imaging device may result in an error message that the feature is not

compatible with the system and/or the machine specific access controls will prevent access to the unlicensed feature.

24. For example, if a user attaches an ultrasound transducer to a Philips ultrasound system, but the related software is not licensed and enabled for that ultrasound system, the imaging functionality will be disabled and the user will receive an error message informing the user that the transducer is incompatible with that specific ultrasound system.

25. Philips medical imaging devices also contain other proprietary software, which Philips refers to as its Customer Service Intellectual Property ("Philips CSIP").

26. Displays on computer screens that appear in connection with accessing Philips' software on Philips medical imaging devices, and the contents of written service and maintenance manuals used by technicians to access Philips medical imaging devices, contain various written warnings, disclosures, and notices that place the user on notice that the software and information being accessed is Philips' proprietary and confidential software that is to be accessed only by authorized and licensed users, and that passwords provided by Philips in connection with such access are, likewise, subject to terms and conditions restricting their usage.

27. Additionally, Philips ensures that it retains—and does retain—ownership of its software even though the physical machine upon which Philips software resides may itself be owned by a hospital, medical center, or other Philips customer. Each Philips medical imaging device contains licensed software and the original purchaser and all subsequent purchasers are bound by the license and expressly authorized only to use the features and tools Philips has licensed for the specific medical imaging device. Philips' license terms are included in agreements that accompany the sale of each Philips medical imaging device, and which bind the purchasers of the

system and all subsequent purchasers or owners of the system, and they prohibit unauthorized access to or modification of Philips' proprietary software.

28. Philips has spent considerable time and money creating this software and developing access controls to limit and control access to these and use of features in the manners described above.

29. Unauthorized access to or changes to the software and related files on Philips medical imaging devices puts Philips' proprietary software at serious risk, and harms Philips' ability to control access to its proprietary software.

**~ The Creation of A Family of Companies With A Piracy Arsenal ~**

30. The goal of Defendants' scheme centered on building a family of companies with an arsenal of tools and methods to obtain unauthorized access to Philips CSIP in its suite of medical imaging devices in order to unfairly compete with Philips. Under the umbrella of Jordan Health Products, the operating companies advertised that they jointly operated as "a single source provider of medical, surgical, diagnostic imaging, and radiation oncology equipment, including sales, service, repair, parts, refurbishing, and installation." The family of companies included Global Medical Imaging, LLC ("GMI"), D.R.E. Medical Group Inc. ("DRE), Oncology Services International, Inc. ("OSI"), Transtate Equipment Company, Inc. ("Transtate"), Equipment Maintenance Solutions, Inc. ("EMS"), Ultra Solutions, LLC ("Ultra Solutions"), Pacific Medical Group, Inc. ("PacMed") and intermediary entities that sat above them and that were formed to formally acquire the operating entities and which were ultimately owned by Jordan Health Products, including Jordan Health Products I, Inc., Jordan Health Products III, Inc., and MERS Holdings, LLC ("MERS") (referred to herein collectively as "the operating companies").

31. Pursuant to written agreements, the operating companies funneled portions of revenue to JHP Management, which was also 100% owned by Jordan Health Products. Specifically, the agreements provided that the operating companies would pay JHP Management a fixed percent of the "consolidated net income before interest, taxes, depreciation, amortization and other non-cash charges, in each case, charged, expensed or accrued against such net income, as reflected in the [operating] [c]ompanies' audited financial statements for the preceding fiscal year (or unaudited statements for any partial year of this Agreement), all as determined by the Board of Directors of Holdings [defined in each agreement to be the respective operating company] ("EBITDA") or such other amounts as shall be agreed upon by the Consultant [JHP Management] and Holdings or such greater amounts approved by the Board of Directors of Holdings." The agreements separately required each of the operating companies to reimburse JHP Management for its expenses, including overhead expenses and personnel costs.

32. JHP also entered into separate agreements with the operating companies that required the operating companies to pay as a "investment banking and sponsorship fee" a percentage of "the aggregate consideration paid" and a separate "financial consulting fee" in connection with company acquisitions.

33. On information and belief, the revenue JHP Management collected from the operating companies was distributed to Jordan and Hogerty either directly or indirectly through entities they own, control or are beneficiaries of, or otherwise benefit from, including without limitation: JZ Capital Partners, TJT (B) Bermuda, Jordan Advisers, Inc., the Jordan Company L.P., The Jordan Company LLC, The Jordan Company OP, LLC, the Jordan Family Office, Jordan/Zalaznick Advisers, Inc., Jordan Industries International, JZ Partners, LLC, TJC Management Corp., H&H Industries. Jordan and Hogerty, either directly or indirectly through

entities they own, control or are beneficiaries of, were also owners of Jordan Health Products, LLC.

34. The initial acquisition in this scheme was GMI, a company whose business practices included modifying the configuration of Philips ultrasound systems to enable clinical features that were not licensed from Philips.

35. GMI also used key generator software to generate unauthorized keys to enable the Techadmin, Superuser and First Responder access on Philips ultrasound systems, which in turn provided access to Philips' restricted proprietary software and massive suite of proprietary service tools.

36. GMI used the unauthorized keys as a core function of its service and repair business and also provided the keys as an enticement to customers who purchased parts or service from GMI or the other operating companies.

37. GMI provided these unauthorized access keys to customers who purchased parts, systems and services as part of a free "technical support" offering and also to customers who routinely engage in business with GMI, Jordan Health Products, or the other operating companies.

38. GMI used and provided the keys to third parties for the purpose of modifying the software on Philips ultrasound systems, including to enable software functionality for new parts, and opening up a Philips ultrasound system to, on information and belief, enable unlicensed and unauthorized options and to access proprietary software tools that are reserved exclusively for Philips engineers and authorized personnel. GMI used and provided the keys to third parties to benefit its parts sale, repair and service business. GMI used software tools to generate unauthorized keys to bypass security on the systems, to enable the techadmin option on Philips ultrasound machines, and to enable others to bypass security on the systems and turn on the techadmin option,

to gain unauthorized and unlicensed access to and use of restricted software features on Philips ultrasound systems.

39. GMI continued to use its key generator through February 2024, nearly three years after Philips commenced the GMI Litigation, which included claims based on the use of the key generator and involves Jordan's company Jordan Industries, for which Hogerty served as the Senior Vice President through April 2024.

40. GMI also used workarounds to access and modify licensed options files. In addition, after representing to the Court that GMI had ceased using any keygenerator, on information and belief, Jordan Health Products and GMI were developing an alternative keygenerator and were actively developing "manual access solutions" to obtain the same access the keygenerator provided. On information and belief, Jordan and Hogerty we aware of and participated in this plan to develop alternative hacking methods.

41. On information and belief, during due diligence GMI disclosed its methods to Hogerty, Jordan and their counsel at Dentons LLP. On information and belief, during due diligence GMI also disclosed that it had been informed its methods violated Philips' Standard Terms and Conditions and Software License Agreements and were unlawful. On information and belief, Jordan and Hogerty were aware of this information and nonetheless failed to stop the ongoing use of GMI's unlawful methods, including after Philips commenced litigation against GMI for this conduct.

42. A couple of years later Jordan Health Products expanded its arsenal when it acquired Transtate Equipment Company, Inc. ("Transtate"), whose business practices included the use of a tool called FDService on certain of Philips Allura Image Guided Therapy medical imaging systems, and use of a fake Integrated Security Tool ("IST") certificate on at least certain Allura

Image Guided Therapy and Computed Tomography ("CT") medical imaging systems. FDService was utilized on Philips Allura x-ray systems by Transtate to circumvent their security to provide unauthorized access to Philips' proprietary software. Transtate's fake IST certificate provided it with access to Philips' protected service tools on at least Image Guided Therapy and CT medical imaging systems and an ability to decrypt Philips' encrypted documents across medical device modalities. On January 27, 2023, the Court in *Philips Med. Sys. Nederland B.V. v. TEC Holdings, Inc.*, Western District of North Carolina Case No. 3:20-cv-21-MOC-DSC (the "Transtate Litigation"), granted summary judgment of liability in Philips' favor on its Computer Fraud and Abuse Act ("CFAA") and Digital Millenium Copyright Act ("DMCA") claims finding that Transtate's use of FDService warranted summary judgment for Philips because, (1) "it is undisputed that Defendants modified files on Plaintiff's Allura systems to bypass Plaintiff's security and permit access to Level 1 and higher CSIP without a Level 1 or higher IST key and password" and (2) "Defendants acquired unauthorized access to Philips' Level 1 and higher CSIP software on Allura systems by creating and using software to bypass Philips' security software." *Philips Med. Sys. Nederland B.V. v. TEC Holdings, Inc.*, No. 3:20-cv-21-MOC-DSC, 2023 U.S. Dist. LEXIS 7319 (W.D.N.C. Jan. 17, 2023). Notwithstanding this Court Order, and a subsequent judgment following a jury trial, on information and belief, Transtate continued to use FDService and was developing a new FDService to access CSIP Level 1 and CSIP Level 2 software. In addition, on information and belief, Jordan Health Products and Transtate were actively developing "manual access solutions" to obtain the same access that FDService provided. On information and belief Jordan and Hogerty we aware of and participated in this plan to continue the use of FDService and to develop alternative hacking methods. On information and belief,

during due diligence Transtate disclosed its use of FDService to Hogerty, Jordan and their counsel at Dentons LLP.

43. The following year, Jordan Health Products acquired Ultra Solutions which, on information and belief, brought with it its own tools for obtaining unauthorized access to Philips proprietary software. Specifically, Ultra Solutions had its own method that it used to permanently enable the tech admin option, and on information and belief unlicensed clinical options, in the software on Philips ultrasound systems. Ultra Solutions also offered for sale to customers an option to enable the tech admin option and to enable a daily superuser passcode. While Philips is not presently aware of the specific method Ultra Solutions possessed to make these modifications or how its methods work, its practice of enabling unlicensed options, enabling tech admin and providing superuser passcodes shows that it had one or more methods or tools to modify and obtain unauthorized access to Philips' proprietary software. On information and belief, the use of these methods continued after acquisition, including after Philips commenced a lawsuit against GMI and Jordan Health Products alleging the unlawful enabling of options on Philips ultrasound systems. On information and belief, during due diligence Ultra Solutions disclosed its tools and methods to Hogerty, Jordan and their counsel at Dentons LLP.

44. On information and belief, the other operating companies had access to and used the tools described in the preceding paragraphs and also had additional tools that they contributed to the arsenal that Philips has not had an opportunity to obtain discovery about. On information and belief, during due diligence the other operating companies disclosed their tools and methods. Jordan Health Products created a specialized department—the Advanced Repair and Technological Services ("ARTS") department—that included key individuals from the operating companies who had created and spearheaded use of the tools, including the GMI key generator

and FDService. The ARTS department had shared drives where these tools and related instructions for obtaining unauthorized access to Philips machines were consolidated, kept and shared. On information and belief, the shared drive was not preserved despite multiple active litigations brought by Philips.

45. In furtherance of this scheme, the operating companies shared personnel and tools, cross trained employees to use the suite of tools and methods in the Jordan Health Products arsenal across medical imaging system modalities and provided computers containing the tools to employees for use during their activities on behalf of Jordan Health Products and the operating entities. The sharing of these hacking tools allowed Jordan Health Products to advertise and offer services and expertise that it would otherwise have been unable to offer, to encourage third parties to purchase parts and services from the operating companies because that purchase included free technical support that made use of the hacking tools, and ultimately to increase profits for the benefit of Defendants, and to unfairly compete with Philips. The sharing of these hacking tools also allowed each of the operating companies to obtain business it would not have otherwise received by promoting access to these hacking tools to customers if they bought parts and service from the operating companies.

46. On information and belief, the companies targeted for acquisition were targeted because they had tools and methods that could contribute to the arsenal or were already utilizing the tools and methods as customers of the operating companies. As an example, and although no acquisition ever took place, one target company that proceeded to formal initial discussions for potential acquisition was KPI Healthcare Inc. ("KPI"), a company that had various methods, including a python-based script or tool, that it purchased and used to modify the licensed options

on Philips ultrasound systems. Philips received a $37 million judgment against KPI for its unlawful activities.

**~ Defendants' Role in the Scheme ~**

47. The unlawful means through which the operating companies conducted business was a core component of the scheme and conspiracy Jordan imagined and in concert with Hogerty, executed to build the Jordan Health Product family of companies.

48. Jordan spearheaded this build-up and Hogerty was Jordan's right hand who he entrusted to carry out this plan. Jordan commenced the buildup through his company, Jordan Industries, which Hogerty was the Senior Vice President of through April 2024. Jordan Industries touted this strategy and the buildup on the Jordan Industries website.

49. Jordan Industries also touted its role in publicly available press releases. The October 2015 press release for the acquisition of GMI states that Jordan Industries acquired GMI. It further states that "JII is pursuing a strategic build-up in the growing, highly fragmented global medical equipment market. As the first platform acquisition, GMI and its management team will be backed by JII's permanent capital base to continue to grow both organically and through acquisition. In addition, JII is pursuing additional platform acquisitions in the broader medical equipment market to further augment GMI's growth and provide cross-selling opportunities among the family of companies."

50. In November 2015, the public press relief for the acquisition of DRE similarly stated that it has been acquired by Jordan Industries and similarly touted the buildup plan: "JII also recently acquired Global Medical Imaging ("GMI"), a leading provider of diagnostic ultrasound systems, nuclear cameras, and maintenance and repair services. JII is pursuing additional platform

acquisitions in the broader medical equipment market to further augment the growth of DRE and GMI and provide cross-selling opportunities among the group of companies."

51. Hogerty was actively involved in drafting the press releases and ran them by Jordan who, on information and belief, approved them before they were issued and released.

52. Jordan and Hogerty directed and oversaw the Jordan Health Products buildup from start to finish. Initially, they spearheaded identifying the target companies and they decided which companies to pursue. As set forth in the proceeding section, the companies targeted were specifically targeted because they had tools and methods to contribute to the arsenal or were already using tools in the arsenal as customers of the operating companies.

53. Once a potential fit was identified, Hogerty led the due diligence—which Jordan funded and had his counsel at Dentons LLP lead—including executing confidentiality agreements and letters of intent, hiring vendors to perform certain due diligence tasks, *e.g.* environmental due diligence. Jordan and Hogerty in conjunction with counsel at Dentons LLP (who represented Transtate in the Transtate Litigation, GMI and Jordan Health Products in the GMI Litigation and Jordan Industries in the GMI Litigation), acquired and reviewed comprehensive due diligence documents from each potential acquisition company and on information and belief maintains copies of the due diligence documents received from the operating companies. Jordan is a successful businessman who is no stranger to conducting due diligence when acquiring new businesses, and his team, led by Hogerty, collectively had decades of experience working for Jordan and acquiring businesses for him and his entities. On information and belief, the due diligence documents requested and that each company provided, disclosed tools and methods for gaining unauthorized access to Philips' protected software and other intellectual property and legal issues related to the use of those tools and methods.

54. On information and belief, Jordan and Hogerty learned of GMI's, Transtate's and Ultra Solutions' methods prior to the acquisitions and those methods were identified and disclosed in material provided by the operating companies during due diligence, including to their counsel Dentons LLP, which on information and belief maintains copies of the due diligence documents received from the operating companies. Jordan and Hogerty further learned that these methods of modifying the proprietary software on Philips systems were unlawful and violated the software license provided with the sale of each system. Despite this, Jordan and Hogerty initiated the acquisitions and failed to stop the continued use of these unlawful methods.

55. On information and belief, Jordan had the ultimate authority to approve and did approve the acquisition of each operating company and approved each step in the acquisition process along the way.

56. JHP Management, also controlled by Jordan, acted to manage the operating entities, and it employed the personnel who acted as the Jordan Health Products management—which included Hogerty. JHP Management funneled the money from the operating companies to companies owned or controlled by Jordan or for which he is a beneficiary (directly or indirectly) or receives a benefit (directly or indirectly) utilizing the complicated network of companies Jordan created to shield his liability and the liability of his companies that profited from this scheme. Jordan caused millions in "related party" transactions to be made from the Jordan Health Products companies to his companies, including Jordan Industries.

57. In the 90 days prior to the operating companies and Jordan Health Products filing for bankruptcy, JHP Management received at least $1.9 million from the operating entities. On information and belief, JHP Management received millions of dollars from the operating companies which it in turn shared with Jordan, Hogerty and entities they owned or controlled or

for which they are a beneficiary (directly or indirectly) or from which they receive benefits (directly or indirectly).

58. On information and belief, JHP Management at all relevant times had the right and ability to supervise the wrongful conduct described herein, including because the personnel who managed the operating entities were employed by JHP Management beginning in 2018, profited from the wrongful conduct alleged herein, and knowingly and voluntarily agreed to conspire with Jordan, Hogerty, Jordan Industries, Jordan Health Products, and the operating companies to violate Philips' rights.

59. JHP Management is also the original owner of the Avante brand trademarks (registration nos. 6201101, 6201102, 6201103) and the Pacific Medical trademarks (serial nos. 90619870 and 90619898). JHP Management filed trademark applications in Class 35 for "Retail store services featuring medical equipment, namely, surgical, imaging, and oncology equipment; wholesale distributorships featuring medical equipment, namely, surgical, imaging, and oncology equipment; on-line wholesale and retail store services featuring medical equipment, namely, surgical, imaging, and oncology equipment" and in Class 37 for "Repair, maintenance, refurbishment and installation of healthcare and medical equipment, namely, surgical, imaging, and oncology equipment." JHP Management assigned the marks to Jordan Health Products I, Inc. in July 2021 – another entity within the complicated corporate structure Jordan and Jordan Industries created which is the entity that sits between GMI and Jordan Health Products.

60. On information and belief, Hogerty and Jordan controlled the litigation and directed counsel representing GMI and Transtate in the GMI Litigation and Transtate Litigation, and Jordan funded the litigation. Even after those lawsuits were filed, and even after Transtate's methods were determined to be unlawful, GMI and Transtate at the direction of Jordan and Hogerty

continued to use the key generator through February 2024 and FDService through at least September 2024. They then oversaw or approved the development of workarounds, manual access solutions and new versions of the key generator and FDService in order to maintain the operating companies' revenue from which they were profiting.

61. Hogerty was the Senior Vice President of Jordan Industries, a director and an officer of JHP Management, and an officer of other companies owned and controlled by Jordan. Hogerty was Jordan's right hand and boots on the ground manager for JHP Management and the Operating Companies who directly influenced, controlled and supervised the management of the Operating Companies. The president of Jordan Health Products (Steven Inacker then Jim Leitl) and the presidents of each of the operating companies reported to Hogerty. Hogerty also oversaw and carried out the acquisition of each of the operating companies, in concert with Jordan, and he vetted the businesses prior to acquisition and oversaw the due diligence process. On information and belief, Hogerty received millions for his central role in the Jordan Health Products buildup and management of the Jordan Health Products companies. Hogerty was the moving force behind Jordan Industries, Jordan Health Products, JHP Management and the operating companies participation in a conspiracy to commit fraud and to build a family of companies with an arsenal of tools and methods to pirate Philips' proprietary software and to use the pirated software to unfairly compete against Philips, and he willfully and deliberately induced, aided and abetted the Jordan/Avante family of companies' piracy. Hogerty personally benefitted from the scheme.

62. Jordan was the Chairman of the Board and lead officer with the ultimate managerial and administrative authority over Jordan Health Products and the operating companies. On information and belief, Jordan made compensation decisions, including who would receive bonuses and in what amount and decisions about who in management would receive equity based

on information and recommendations provided by Hogerty. Jordan was also a board member of Jordan Health Products and the operating entities, and he had the ultimate authority over Jordan Industries, Jordan Health Products and the operating entities. On information and belief, Jordan, at all relevant times, also had managerial and administrative authority over Jordan Industries. On information and belief, Jordan had the right and ability to stop or limit the conduct described herein, and he (directly or indirectly through entities he owns, controls or is a beneficiary of) is an ultimate financial beneficiary of the wrongful conduct alleged herein. On information and belief, Jordan received millions in profits from the wrongful conduct alleged herein annually through his dozens of businesses and trusts, including Jordan Industries. Jordan was the moving force behind his namesake companies Jordan Industries, Jordan Health Products, JHP Management and the operating companies participation in a conspiracy to commit fraud and to build a family of companies with an arsenal of tools and methods to pirate Philips' proprietary software and to use the pirated software to unfairly compete against Philips, and he willfully and deliberately induced, aided and abetted the Jordan/Avante family of companies' piracy. Jordan personally benefitted from the scheme.

63. Notwithstanding their ability to do so, Defendants did not stop the unlawful conduct because they were reaping the rewards of the tens of millions of dollars that the operating companies were generating annually.

64. After Philips commenced litigation against Transtate, Jordan and Hogerty took action to obfuscate their involvement, including by having Jordan Health Products—a name overtly tied to Jordan and his business—change to operate as Avante Health Solutions. On information and belief, Jordan personally benefitted while using a web of corporations to conceal his interests and involvement. Then, after judgment was entered in the Transtate Litigation and as

discovery in the GMI Litigation revealed clear and substantial liability, in an effort to make Jordan Health Products, GMI and Transtate judgment proof, Defendants devised a plan to siphon value, including revenue and profits, from the operating companies while overleveraging the businesses to eliminate recoverable assets. The overleveraging included causing them to enter into a massive loan agreement despite significant revenues, which on information and belief went through JHP Management to Jordan and/or businesses he owned and controlled or otherwise benefitted from (directly or indirectly).

**~ Philips' Discovery of Defendants' Role in the Scheme ~**

65. Jordan and Hogerty have disavowed and hidden their involvement in this scheme for years, claiming that they played no role in the operating entities and received no financial benefits from them.

66. Until Philips obtained the filings from the Bankruptcy Proceedings in October and November 2024, and the AHS Documents in April and May 2025, Philips was not aware of and unable to uncover facts establishing Defendants' direct role in the scheme or their conduct sufficient to give rise to claims against Defendants. These documents evidence Defendants' knowledge and oversight of Jordan Health Products and the operating companies sharing of at least the following hacking tools:

a. a key generator, and other tools and methods to (i) enable Techadmin, Superuser and First Responder access on Philips ultrasound systems, which in turn provided access to Philips' massive suite of proprietary service tools, (ii) enable unlicensed clinical options on Philips ultrasounds, (iii) circumvent the security on Philips ultrasound systems, and (iv) decrypt encrypted software outputs; and

b. FDService to circumvent Philips' security and obtain unauthorized against to Philips' proprietary service tools Philips Allura cath lab systems.

67. It was also not until review of the documents filed in the Bankruptcy Proceedings and the receipt of the AHS Documents that Philips was able to learn of JHP Management's role in this scheme and conspiracy and specifically its liability resulting from its role as the money mover:

a. JHP Management controls the flow of money from the operating companies to Jordan Industries and the dozens of businesses and trusts Jordan owns or controls or otherwise benefits from. From these documents, Philips learned that the operating companies paid millions of dollars directly to JHP Management. JHP Management in turn dispersed the money, on information and belief to entities which are owned, directly or indirectly, by Jordan, including Jordan Industries, and Jordan in turn compensated Hogerty for his loyalty and direct management of the operating companies. On information and belief, JHP Management's primary role in the conspiracy was to siphon money from the operating entities and disperse it for the benefit of Jordan and his entities. In the 90 days prior to commencing bankruptcy, the operating entities collectively sent JHP Management $1.9 million.

b. JHP Management also took part in the conspiracy by compensating the officers and employees who executed on the plan to build a family of companies that profits from pirating Philips' proprietary software.

68. It was also not until review of the documents filed in the Bankruptcy Proceedings and the receipt of the AHS Documents that Philips learned of Jordan's role in the scheme and conspiracy and his liability resulting from his exercise of administrative and managerial authority

to act as the moving force behind Jordan Industries, Jordan Health Products and the operating entities' conduct and to willfully and deliberately induce, aid and abet that conduct:

a. Jordan had the ultimate say so at all levels of this scheme, and on information and belief, he placed himself in the lead officer position at each level of the Jordan Health Products family of companies to cement his ability to control, oversee and supervise the Jordan Health Products family of companies and to maximize his personal profits, and he acted as the moving force to approve and carry out the unlawful conduct alleged herein. Jordan controlled financial plans and budgets for the operating companies, approved the implementation of shared resources and tools to maximize cross-selling, made personnel decisions and participated in and directed the litigation strategy and oversight.

b. The management employees and officers of Jordan Health Products, JHP Management and Jordan Industries reported directly to Jordan, who post-acquisition made financial, personnel and operational decisions about the operating companies, including about budgeting, corporate spending, operational strategies, personnel decisions and marketing plans.

c. To shield his liability and hide the fact that he directly or indirectly funded the buildup of the Jordan Health Products family of companies, controlled the companies, and benefited financially from their piracy, Jordan established a complicated web of businesses and trusts, many of which appear to be empty shell corporations, which he utilized to avoid direct links to GMI, Transtate and Jordan Health Products. On information and belief, Jordan received, directly or indirectly through his dozens of business and trusts, at least a portion of the millions of dollars

that JHP Management siphoned from the Jordan Health Products family of companies, including through his ownership of Jordan Industries.

69. It was also not until review of the documents filed in the Bankruptcy Proceedings and the receipt of the AHS Documents that Philips learned of Hogerty's role in the scheme and conspiracy and specifically, his liability resulting from his exercise of administrative and managerial authority to act as Jordan's boots on the ground right hand and the moving force behind Jordan Industries, Jordan Health Products and the operating entities' conduct and to willfully and deliberately induce, aid and abet that conduct:

a. Hogerty was an officer and board member at each level of the Jordan Health Products family of companies that participated in the control, oversight and supervision of the Jordan Health Products family of companies and to maximize his personal profits, and he acted as the moving force to approve and carry out the unlawful conduct alleged herein. Hogerty prepared and proposed financial plans and budgets for the Jordan Health Products family of companies, directed and managed personnel, including the operating companies' presidents, and with the approval of Jordan, he implemented those plans and the use of shared resources and tools to maximize cross-selling, made personnel decisions and participated in litigation strategy and oversight.

b. Hogerty was the management ringleader for Jordan Health Products, JHP Management and Jordan Industries and he reported directly to Jordan and obtained his approval about the operations of the Jordan Health Products family of companies, including about budgeting, corporate spending, operational strategies, personnel decisions and marketing plans. Hogerty also oversaw and carried out the

strategy of cross selling amongst the Jordan Health Product companies, including the sharing the unlawful methods and tools in the Jordan Health Products arsenal and cross training employees to use those tools across medical imaging system modalities.

c. Hogerty led the pre-acquisition due diligence and approved each acquisition despite knowledge learned during due diligence about the operating companies' unlawful methods and tools. Hogerty identified target companies, and when he determined that they were a strategic fit for the business, *i.e.* they had tools and methods to share to pirate Philips software or their employees were already or willing to use those tools and methods to pirate Philips software, he carried the acquisition forward.

d. On information and belief, Hogerty is compensated handsomely by Jordan and his businesses.

e. Hogerty is also an "owner" of the operating companies according to the documents filed in the Bankruptcy Proceeding.

**<u>COUNT I</u>**
**Vicarious Liability for Circumventing and Trafficking a Technological Measure – 17 U.S.C. § 1201**
**(All Defendants)**

70. Philips restates and re-alleges all of the allegations of all the paragraphs in this complaint as though fully set forth herein this Count I.

71. Philips medical imaging systems include Philips' copyrighted and proprietary software.

72. The clinical software and diagnostic and service tools software in Philips ultrasound and Image Guided Therapy systems are protected by copyright under Title 17, and include without

limitation Philips service tools for updating or modifying the licensed options available on an ultrasound machine, and for modifying identification numbers associated with a machine.

73. The log file output and user interfaces of Philips systems are also respectively protected by copyright under Title 17 as non-literal elements of Philips software installed on and executing on Philips systems.

74. Philips medical imaging device clinical software is also protected by copyright under Title 17.

75. Philips employs numerous access controls to protect and control access to and restrict use of its copyrighted proprietary software and/or portions thereof.

76. Philips' access controls include technological measures to protect and control access to and limit use of its copyrighted proprietary software and/or portions thereof.

77. Prior to being acquired by AHS, GMI knowingly and intentionally circumvented Philips' access controls by using a key generator to generate unauthorized "keys" and other tools and methods to (i) enable the Techadmin, Superuser and First Responder access on Philips ultrasound systems, which in turn provided access to Philips' restricted proprietary software and massive suite of proprietary service tools, (ii) enable unlicensed clinical options on Philips ultrasound systems, (iii) circumvent the security on Philips ultrasound systems, and (iv) decrypt encrypted software outputs. GMI also knowingly and intentionally bypassed Philips' access controls to gain access to Philips' medical imaging system onboard tools and files for updating, modifying, or adding Philips software options—tools and files that only Philips authorized personnel are able to access using either Philips generated key codes or Philips authorized access control dongles to comply with Philips access controls.

78. Prior to being acquired by AHS, GMI modified the clinical option configuration on Philips ultrasound systems to enable unlicensed clinical features without paying for them. For example, in or about March 2020, a Philips FSE onsite and performing routine service and maintenance discovered that St. Peters Hospital in Albany, New York had an Epiq ultrasound system with unlicensed software and clinical options. St. Peters Hospital purchased the system from third party Soma Technology who purchased the system from GMI. Prior to selling the system to Soma Technology, GMI used tools or methods to bypass Philips' security and access controls to enable unlicensed clinical options, without paying for a license. GMI enabled clinical options, including the clinical option "Transducer Option VeriSight" that, at the time of discovery in or about March 2020, was not FDA-approved or available for license and use. Neither GMI, nor its customers, were licensed by Philips to enable or use these options.

79. Prior to being acquired by AHS, Ultra Solutions knowingly and intentionally circumvented Philips' access controls by using an unauthorized tool or tools to generate passcodes to (i) enable the Techadmin and Superuser access on Philips ultrasound systems, which in turn provided access to Philips' restricted proprietary software and massive suite of proprietary service tools, (ii) enable unlicensed clinical options on Philips ultrasound systems, and (iii) circumvent the security on Philips ultrasound systems. Ultra Solutions also knowingly and intentionally bypassed Philips' access controls to gain access to Philips' medical imaging system onboard tools and files for updating, modifying, or adding Philips software options—tools and files that only Philips authorized personnel are able to access using either Philips generated key codes or Philips authorized access control dongles to comply with Philips access controls.

80. Prior to being acquired by AHS, Transtate knowingly and intentionally circumvented Philips' access controls by using FDService. As the Court in the Transtate Litigation

found, Transtate modified files on Philips systems to bypass Philips' security measures and permit access to protected materials in violation of the DMCA and CFAA.

81. Prior to the AHS acquisition, through at least September 2024, GMI, Ultra Solutions and Transtate knowingly and intentionally circumvented Philips' access controls to gain unauthorized access to Philips' protected software works and to enable features of these software works which Philips has not licensed or authorized GMI, Ultra Solutions, Transtate, or their customers, to make use of. Through these unlawful means, GMI, Ultra Solutions and Transtate unlawfully gain access to unlicensed Philips software and provide such unauthorized access to subsequent users of Philips' machines hacked by GMI, Ultra Solutions and Transtate.

82. Prior to the AHS acquisition, GMI, Ultra Solutions and Transtate, furthermore, hacked and continued to knowingly and intentionally hack through at least September 2024 one or more of Philips' technological measures to circumvent these access controls to gain unauthorized access to a variety of copyrighted works. GMI and Ultra Solutions circumvented Philips controls that limit access to Philips' copyright protected software works to enable optional features of these software works which Philips has not licensed or authorized GMI, Ultra Solutions, Transtate, or their customers, to make use of. Philips has the right to employ technological measures to protect, and control access to, Philips copyright protected works within Philips ultrasound systems, the operating system within which Philips copyright protected works are executed, and the files stored within the operating systems' file structure.

83. Prior to the AHS acquisition, GMI, Ultra Solutions and Transtate knowingly and intentionally employed these hacked machines providing unlicensed access to Philips copyright protected software and files to their employees to provide a parts repair and service business, and

hacked the Philips machines owned by their customers in furtherance of both their parts repair business and their service contract business.

84. Prior to the AHS acquisition, GMI further provided training to its customers that included instructions about how to circumvent Philips' access controls with GMI and Avante's hacking tools and techniques.

85. GMI, Ultra Solutions and Transtate's intentional and knowing circumvention of the technological measures Philips uses to effectively control access to a work or works protected under Title 17 violated 17 U.S.C. § 1201(a)(1) of the Digital Millennium Copyright Act.

86. GMI, Ultra Solutions and Transtate's techniques and tools are, or at least include, devices, products, components, or parts thereof that are primarily designed or produced for the purpose of circumventing Philips' access controls that protect Philips' software. Thus, GMI, Ultra Solutions and Transtate are also in the business of knowingly marketing, manufacturing, offering to the public, and/or trafficking in a product, device, component, or part thereof, that is primarily designed or produced for the purpose of circumventing Philips' access controls that protect and control access to Philips' software and make use of tools, including the key generator and FDService, which have no use but to circumvent access controls in violation of the DMCA, 17 U.S.C. § 1201(a)(2).

87. Defendants are vicariously liable for the foregoing conduct of GMI, Ultra Solutions and Transtate, because at all relevant times they had the ability to stop or limit the conduct and failed to do so, and they profited from and had a direct financial interest in the foregoing violations of the DMCA.

88. Jordan is vicariously liable for the foregoing conduct of GMI, Ultra Solutions and Transtate because, as discussed above, he had the right and ability to stop or limit the conduct and failed to do so, and he profited from their conduct.

89. Hogerty is vicariously liable for the foregoing conduct of GMI, Ultra Solutions and Transtate because, as discussed above, he had the right and ability to stop or limit the conduct and failed to do so, and he profited from their conduct.

90. JHP Management is vicariously liable for the foregoing conduct of GMI, Ultra Solutions and Transtate because, as discussed above, it had the right and ability to stop or limit the conduct and failed to do so, and it profited from their conduct.

91. Philips has been damaged by Defendants' conduct in an amount not presently known with certainty, but that will be proven at trial and is at least in the amount that the defendants in the GMI Litigation and the Transtate Litigation have been determined to be liable, damages for which Defendants are jointly and severally liable.

92. Philips is entitled to the range of relief provided by 17 U.S.C. § 1203, including but not limited to, compensatory damages or statutory damages, and Philips' costs and attorneys' fees in amounts to be proven at trial.

93. Philips is entitled to increased damages under 17 U.S.C. § 1203(c)(4) because Defendants are vicariously liable for Transtate's repeated violations after judgment was entered against it for such a violation.

## COUNT II
## Vicarious Liability for Modifying Copyright Management Information – 17 U.S.C. § 1202
## (All Defendants)

94. Philips restates and re-alleges all of the allegations of all the paragraphs in this complaint as though fully set forth herein this Count II.

95. Philips' proprietary software is protected by copyright laws, and Philips owns the copyright in its protected software.

96. When a Philips ultrasound system boots up, a Philips access controls allow the system to load only the licensed optional software based on machine specific configurations controlled by Philips access controls. This automated system allows Philips to exclude unlicensed use of optional software and thus automatically enforces the terms and conditions under which Philips makes its software available on a Philips ultrasound system.

97. Philips' machine specific configuration files for controlling access only to licensed optional software include copyright management information under 17 U.S.C. 1202(c).

98. GMI's and Ultra Solutions' business of modifying Philips ultrasound systems included modifications to such copyright management information and is intended to allow users to make unauthorized access to unlicensed portions of Philips' protected software.

99. On information and belief, GMI's and Ultra Solutions' sale of modified ultrasound systems included providing or distributing modified machine specific configurations. GMI's and Ultra Solutions' business of selling Philips ultrasound systems with modified copyright management information was done intentionally and for the purpose of distributing falsified copyright management information knowing that the copyright management information has been altered. And GMI and Ultra Solutions knew, had reasonable grounds to know, or intended that their behavior facilitate, enables, or induces their customers to infringe Philips' rights under Title 17.

100. GMI and Ultra Solutions modified copyright management information when they enabled unlicensed optional features of Philips ultrasound software within a particular ultrasound system, GMI and Ultra Solutions' intentionally altered the terms and conditions upon which

Philips licensed the use of Philips software stored within that particular ultrasound system. These terms and conditions for use of Philips optional copyright protected software works are copyright management information under § 1202(c)(6). These terms and conditions are stored within a specific file, referred to herein as a "licensed options file." These terms and conditions are tracked within Philips' data systems and are determined when a Philips customer purchases a new system or when a Philips customer purchases an upgrade for a previously purchased system. In either case, Philips generates a licensed options file based on the software licensed according to the customer's specific purchase as it is tracked within Philips data systems.

101. GMI and Ultra Solutions intentionally altered the copyright management information knowing, or having reasonable grounds to know, that it induces and enables and facilitates infringement of Philips' rights under Title 17. When GMI and Ultra Solutions altered this copyright management information, the copyright management information was falsified as it no longer matches the configuration of that machine as it is defined within Philips' data systems that Philips uses to, among other things, maintain a record of how Philips has licensed its software. GMI and Ultra Solutions did this surreptitiously, using counterfeit access keys and passcodes, to conceal, from both customers and Philips, the infringement GMI and Ultra Solutions induced, enabled and facilitated.

102. The CMI stored within a Philips licensed options file within a particular Philips ultrasound system is distributed as electronically stored information within the Philips ultrasound system. In other words, the CMI runs with the specific Philips ultrasound system for which it was created as electronically stored information. This CMI functions within such a Philips ultrasound system as part of Philips' automated rights management software, and serves as a key component of access control software within a Philips system, as explained further below. In the normal course

of intended operation of a Philips ultrasound system, the Philips licensed options file itself is protected by Philips user-based access controls and is not accessible to a user without Philips Field Service Engineer level access credentials.

103. GMI and Ultra Solutions knowingly modified and falsified CMI on Philips ultrasound systems.

104. The licensed options file for a Philips ultrasound system includes a variety of copyright management information under 17 U.S.C. § 1202(c) stored in a specific form according to a specific syntax. A licensed options file also includes among other things a Philips copyright notice, such as the following:

> COPYRIGHT KONINKLIJKE PHILIPS ELECTRONICS N.V. 2013
> All rights are reserved. Reproduction in whole or in part is prohibited without the written consent of the copyright owner.

105. A licensed options file also includes system identifying information, including the system's unique serial number, which is also physically stamped on an identification plate on the housing of the corresponding ultrasound system, and the system model, and an identification of the Philips system software and version.

106. A licensed options file also includes an explicit list of "Licensed Clinical Option[s]" as well as lists of other types of licensed options. For each such option, the licensed option file also includes an explicit statement or indicator of whether the software corresponding to such option is enabled or disabled, *i.e.*, licensed from Philips or not licensed, by Philips for the specifically identified machine identified in the licensed options file. Such an explicit statement identifies the specific optional software feature by a unique Philips part number together with a statement of whether each uniquely identified software option is licensed for use on the specifically identified Philips system and a statement the term or duration of such license.

107. Thus, a licensed option file includes identifying numbers (unique part numbers) that refer to licensable options available in the Philips' software residing on a Philips ultrasound system. The licensed option file also includes identifying numbers that correspond to the specific software and version number of the Philips software installed within a specific Philips system identified by serial number. These identifying numbers are explicit references to Philips software and specific optional software that customers may purchase with a system or as a later upgrade for the ultrasound system identified by serial number. These identifying numbers are also copyright management information.

108. A licensed options file also includes, in each listing of each such optional software and the system software, a description of the corresponding software and an indication of whether each such optional software is licensed for use on the specific ultrasound system and for how long. The information in the licensed options file sets forth the terms and conditions for use of the copyrighted work installed on the specifically identified ultrasound system, and therefore is copyright management information.

109. When GMI and Ultra Solutions enabled unlicensed options, Defendants alter the terms and conditions statements by at least changing an unlicensed option statement to a licensed option statement for the specifically identified software within the particular ultrasound system identified by the serial number stored within the licensed option file, thereby falsifying the terms and conditions from those created by Philips for the software within that machine.

110. These licensed options statements are automatically enforced by Philips' software within a Philips system. That software controls whether optionally licensed software may execute within the ultrasound system bearing the serial number identified in the licensed options file. Thus, a Philips licensed options file is part of an automated rights management system that allows access

to only those specifically identified features that Philips has licensed for use on that specifically identified system pursuant to an authorized license of such software from Philips. Thus, Philips licensed options files include copyright management information and operate as part of a technological measure that effectively controls access to Philips software within a Philips imaging system (and these measures are circumvented when the falsified copyright management is read by Philips automated rights management system).

111. GMI and Ultra Solutions did this for the purpose of enabling and thereby creating unlicensed copies of Philips software, and thus for the purpose of furthering copyright infringement, by either GMI and/or its customers.

112. Philips licensed options files also include identifying numbers that refer to copyright management information. As explained above, in addition to part numbers identifying each individual licensable feature, a licensed options file includes a part number that uniquely identifies the software name and version number of the Philips ultrasound software platform (*e.g.*, CX-50 version 2.0) installed within the ultrasound system bearing the serial number identified in the licensed options file. If the software version that is installed within a Philips ultrasound system changes, the licensed options file is updated to reflect that change with a different uniquely identifying software version part number.

113. Neither GMI nor and Ultra Solutions was authorized by Philips to enable optional software features within a Philips ultrasound system for itself or on behalf of any other party, thus GMI and Ultra Solutions alter CMI and provide falsified CMI without Philips authority, *i.e.*, without the authority of the copyright owner.

114. GMI and Ultra Solutions did this, on information and belief, using tool(s) that are presently unknown to Philips but which will be revealed through discovery that Ultra Solutions

had and added to the arsenal upon acquisition and the GMI key generator which is configured by GMI to create authorized access keys which, among other things, modify terms and conditions and/or identifying part numbers (depending on the particular service) stored in a licensed options file, which as explained above, is itself part of Philips automated copyright management system within Philips ultrasound system. GMI and Ultra Solutions did this to circumvent Philips' automated rights management software to gain access to Philips' copyright protected software stored within Philips ultrasound systems, and thus conceal copyright infringement that is furthered by GMI's and Ultra Solutions' modifications.

115. Such modified licensed options files are stored within the specific Philips ultrasound system for which it is created or modified, and is therefore distributed by GMI to GMI's customers and by Ultra Solutions to Ultra Solutions' customers within the Philips ultrasound system in which GMI and Ultra Solutions modify the options file to provide false CMI.

116. On information and belief, GMI's and Ultra Solutions' sale and servicing of ultrasound systems included providing or distributing modified Philips licensed options files with false CMI, including false terms and conditions, to create unlicensed copies of Philips' software.

117. GMI's and Ultra Solutions' business of modifying copyright management information was done intentionally and for the purpose of distributing falsified copyright management information knowing that the copyright management information has been altered, including to enable unlicensed software or to force compatibility between a system and an accessory. GMI and Ultra Solutions knew, had reasonable grounds to know, or intended that their behavior facilitates, enables, or induces their customers to infringe Philips rights under Title 17, because GMI used a counterfeit key generator to create access keys and Ultra Solutions used unauthorized tool(s) to create passcodes for purpose of providing unlicensed access to Philips

software and to Philips log file information.

118. Philips has not authorized GMI to modify or provide such falsified copyright management information, nor has Philips authorized the modification of any copyright management information or the unlicensed use of Philips' proprietary optional software.

119. GMI and Ultra Solutions knowingly and with the intent to induce, enable, facilitate, or conceal infringement by their customers provided falsified copyright management information and/or distributed falsified copyright management information in violation of 17 U.S.C. § 1202(a). GMI and Ultra Solutions carried out their alteration of CMI within Philips' licensed options files for the purpose of enabling unlicensed software options to enable unlicensed options or other software, and did so to provide such unlicensed access to Philips software for both themselves and their customers.

120. GMI's and Ultra Solutions' intentional alteration of Philips' copyright management information and subsequent distribution of modified licensed options files for accessing unlicensed portions of Philips' proprietary software was done with the knowledge that such behavior induces, enables, facilitates, or conceals infringement of Philips' copyright in its proprietary software in violation of 17 U.S.C. § 1202(b). GMI and Ultra Solutions provided altered falsified CMI to their customers by deploying the falsified CMI within customer's medical imaging systems when GMI and Ultra Solutions enabled unlicensed optional software or other features. GMI and Ultra Solutions did this so that their customers would, likely unwittingly, use unlicensed Philips' software to enable the medical imaging system to operate the GMI-installed or Ultra Solutions-installed components or GMI or Ultra Solutions enabled options. When customers then use the components or options GMI or Ultra Solutions enabled by modifying the terms and conditions and identifying information in the options file, the customers, knowingly or unknowingly, create

unlicensed copies of Philips' software, thus infringing Philips' copyrights. GMI and Ultra Solutions thus knowingly modified terms and conditions and identifying information in the options file to induce its customers to infringe Philips' copyrights.

121. When a user of a Philips Allura system navigates to field service software, a Philips access controls check user-specific authentication information, including an encrypted IST certificate containing the specific user's entitlements and the user's password, and allow the system to load and make available to the user only the field service software that the user is authorized by Philps to access based on the user's designated CSIP level. This automated system allows Philips to exclude unlicensed use of field service software and thus automatically enforces the terms and conditions under which Philips makes its software available on a Philips Allura system.

122. Philips' specific configuration files for controlling access only to licensed field service software include copyright management information under 17 U.S.C. 1202(c).

123. Transtate's business of modifying Philips Allura systems included modifications to such copyright management information and was intended to allow users to make unauthorized access to and use of unlicensed portions of Philips' protected software.

124. Transtate modified copyright management information when they enabled access to unlicensed field service software on Philips Allura systems, Transtate intentionally altered the terms and conditions upon which Philips authorizes the use of Philips software stored within that particular Allura system. These terms and conditions for use of Philips field service copyright protected software works are copyright management information under § 1202(c)(6). These terms and conditions are stored within a specific file, referred to herein as a "registry file."

125. Transtate intentionally altered the copyright management information knowing, or having reasonable grounds to know, that it induces and enables and facilitates infringement of Philips' rights under Title 17. When Transtate altered this copyright management information, the copyright management information was falsified as it no longer matches the configuration of that machine as it was designed by Philips. Transtate did this surreptitiously, using its FDService software, to conceal, its CMI modifications and infringement.

126. The CMI stored within a Philips registry file within a particular Philips Allura system is distributed as electronically stored information within the Philips Allura system. In other words, the CMI runs with the specific Philips Allura system for which it was created as electronically stored information. This CMI functions within such a Philips Allura system as part of Philips' automated rights management software, and serves as a key component of access control software within a Philips system, as explained further below. In the normal course of intended operation of a Philips Allura system, the Philips registry file itself is protected by Philips user-based access controls and is not accessible to a user without Philips Field Service Engineer level access credentials.

127. Transtate knowingly modified and falsified CMI on Philips Allura systems.

128. The registry file for a Philips Allura system includes a variety of copyright management information under 17 U.S.C. § 1202(c) stored in a specific form according to a specific syntax.

129. A registry file also includes system identifying information, including the system's unique serial number, which is also physically stamped on an identification plate on the housing of the corresponding Allura system and an identification of the Philips system software and version.

130. A registry file also includes parameters for each item of field service software, including the user-specific level required to access and use each item of field service software. The information in the registry file therefore sets forth the terms and conditions for use of the copyrighted work installed on the specifically identified Allura system, and therefore is copyright management information.

131. When Transtate modified the registry files to provide unlicensed access to Philips' field service software that they were not licensed to access, Defendants altered the terms and conditions statements, thereby falsifying the terms and conditions from those created by Philips for the software within that machine.

132. These terms and conditions are automatically enforced by Philips' software within a Philips system. That software controls whether items of field service software may execute within the Allura system bearing the serial number identified in the licensed options file. Thus, a Philips registry file is part of an automated rights management system that allows access to only those specifically identified features that Philips has licensed for use on that specifically identified system pursuant to an authorized license of such software from Philips. Thus, Philips registry files include copyright management information and operate as part of a technological measure that effectively controls access to Philips software within a Philips imaging system (and these measures are circumvented when the falsified copyright management is read by Philips automated rights management system).

133. Transtate did this for the purpose of enabling and thereby creating unlicensed copies of Philips field service software, and thus for the purpose of furthering copyright infringement, by either Transtate and/or its customers.

134. Transtate was not authorized by Philips to enable field service software features

within a Philips Allura system for itself or on behalf of any other party, thus Transtate alters CMI and provide falsified CMI without Philips authority, *i.e.*, without the authority of the copyright owner.

135. Transtate did this, on information and belief, using their FDService software which was configured by Transtate to modify terms and conditions stored in a system's registry file, which as explained above, is itself part of Philips automated copyright management system within Philips Allura system. Transtate did this to circumvent Philips' automated rights management software to gain access to Philips' copyright protected software stored within Philips Allura systems, and thus conceal copyright infringement that is furthered by Transtate's modifications.

136. Transtate's servicing of Allura systems included modifying Philips registry files with false CMI, including false terms and conditions, to create unlicensed copies of Philips' software.

137. Philips has not authorized Transtate to modify copyright management information or make unlicensed use of Philips' proprietary field service software.

138. Transtate knowingly and with the intent to induce, enable, facilitate, or conceal infringement provided falsified copyright management information and/or distributed falsified copyright management information in violation of 17 U.S.C. § 1202(a). Transtate carried out their alteration of CMI within Philips' registry files for the purpose of enabling unlicensed field service software.

139. Transtate's intentional alteration of Philips' copyright management information for accessing unlicensed portions of Philips' proprietary software was done with the knowledge that such behavior induces, enables, facilitates, or conceals infringement of Philips' copyright in its proprietary software in violation of 17 U.S.C. § 1202(b).

140. On information and belief, at all relevant times Defendants had an obvious and direct financial interest in GMI's, Ultra Solutions' and Transtate's CMI falsification and modification methods and tools as described further above.

141. On information and belief, at all relevant times Defendants had the right and ability to supervise the work of GMI's, Ultra Solutions' and Transtate's employees or to stop or limit their unlawful conduct.

142. Because Defendants had the right and ability to supervise the CMI falsification and modification actions of GMI and Transtate, and because Defendants benefitted financially from GMI's, Ultra Solutions' and Transtate's CMI falsification and modification actions, Defendants are vicariously liable for GMI's, Ultra Solutions' and Transtate's violations of 17 U.S.C. § 1202 as set forth in this Complaint.

143. Philips has been damaged by the conduct of Defendants in an amount not presently known with certainty, but that will be proven at trial.

144. Philips is entitled to the range of relief provided by 17 U.S.C. 1203, including but not limited to, compensatory damages or statutory damages, and Philips' costs and attorneys' fees in amounts to be proven at trial.

## COUNT III
## Civil Conspiracy to Commit Fraud and Engage in Unfair Competition
## (All Defendants)

145. Philips restates and re-alleges all of the allegations of all the paragraphs in this complaint as though fully set forth herein this Count III.

146. On information and belief Defendants have engaged in a conspiracy with Jordan Industries, Jordan Health Products and the operating companies, including at least GMI, Transtate

and Ultra Solutions, (collectively the "co-conspirators") to engage in fraud and unfair competition as set forth in this complaint.

147. On information and belief Defendants' agreement to and participation in a conspiracy to build a family of companies to engage in unfair competition as described in this complaint was intended to generate a profit for Defendants and they also conspired to undercapitalize the operating companies with a massive loan despite the operating companies generating substantial revenue in order to personally profit. The conspiracy culminated in driving the operating entities into bankruptcy to make them judgment proof.

148. Defendants conspired with the co-conspirators to commit fraud.

149. GMI made false representations of material fact to Philips by impersonating a Philips FSE when using a keys from their key generator. The keys provided GMI and Jordan Health Products with access to the proprietary software on Philips ultrasound systems, specifically its CSIP Level 1 and higher service tools, by representing that they had the authority to access Philips' proprietary software, including tools reserved for Philips engineers. Each time GMI generated or used a key, which they did frequently during the relevant time period, including repeatedly in the years since Philips brought a lawsuit against GMI, they made a false, material misrepresentation because they misrepresented that they were authorized to have CSIP Level 1 and higher access. GMI never had above Level 0 access. The misrepresentation was material because Philips would not have provided access to the Level 1 and higher software to GMI and Jordan Health Products, and but for the use of the keys, they would not have been able to access and use such software. GMI knew the representation that GMI had Level 1 and higher access of a Philips Field Service Engineer was false. GMI intended for Philips to rely on the misrepresentation because the purpose of the keys was to trick Philips' security software into giving GMI access to

proprietary software that they were not authorized to access. In reliance on the misrepresentations through use of the generated keys, Philips, through its security software, provided GMI with access to its Level 1 and higher proprietary software. Philips was harmed by this conduct, including amongst other damages, the loss of its competitive advantage because GMI acquired valuable CSIP Level 1 and higher tools at no cost, whereas Philips invested significant time and financial resources to development those tools, which it does not make available to competitors.

150. Ultra Solutions made false representations of material fact to Philips by impersonating a Philips FSE when using a passcodes/keys to enable techamdin and superuser on Philips ultrasound systems. The passcodes/keys provided Ultra Solutions with access to the proprietary software on Philips ultrasound systems, specifically its CSIP Level 1 and higher service tools, by representing that they had the authority to access Philips' proprietary software, including tools reserved for Philips engineers. Each time Ultra Solutions generated or used a passcode/key, which, on information and belief, they did during the relevant time period, including repeatedly in the years after Philips brought a lawsuit against GMI, they made a false, material misrepresentation because they misrepresented that they were authorized to have CSIP Level 1 and higher access. Ultra Solutions never had above Level 0 access. The misrepresentation was material because Philips would not have provided access to the Level 1 and higher software to Ultra Solutions, and but for the use of the passcodes/keys, they would not have been able to access and use such software. Ultra Solutions knew the representation that Ultra Solutions had Level 1 and higher access of a Philips Field Service Engineer was false. Ultra Solutions intended for Philips to rely on the misrepresentation because the purpose of the passcodes/keys was to trick Philips' security software into giving Ultra Solutions access to proprietary software that they were not authorized to access. In reliance on the misrepresentations through use of the generated keys,

Philips, through its security software, provided Ultra Solutions with access to its Level 1 and higher proprietary software. Philips was harmed by this conduct, including amongst other damages, the loss of its competitive advantage because Ultra Solutions acquired valuable CSIP Level 1 and higher tools at no cost, whereas Philips invested significant time and financial resources to development those tools, which it does not make available to competitors.

151. Transtate made false representations of material fact to Philips by impersonating a Philips FSE when using a fake IST certificate to gain unauthorized access to proprietary software on Philips Image Guided Therapy and CT systems, specifically CSIP Level 1 and higher service tools, by representing that they had the authority to access Philips' proprietary software, including tools reserved for Philips engineers. Each time Transtate used a fake IST certificate, which it did during the relevant time period, they made a false, material misrepresentation because they misrepresented that they were authorized to have CSIP Level 1 and higher access. Transtate never had above Level 0 access. The misrepresentation was material because Philips would not have provided access to the Level 1 and higher software to Transtate, and but for the use of the fake IST certificate, they would not have been able to access and use such software. Transtate knew the representation that Transtate had Level 1 and higher access of a Philips Field Service Engineer was false. Transtate intended for Philips to rely on the misrepresentation because the purpose of the fake IST certificate was to trick Philips' security software into giving Transtate access to proprietary software that they were not authorized to access. In reliance on the misrepresentations through use of the fake IST certificate, Philips, through its security software, provided Transtate with access to its Level 1 and higher proprietary software. Philips was harmed by this conduct, including amongst other damages, the loss of its competitive advantage because Transtate acquired

valuable CSIP Level 1 and higher tools at no cost, whereas Philips invested significant time and financial resources to development those tools, which it does not make available to competitors.

152. In furtherance of the scheme and conspiracy to build a family of companies that profits from piracy, while Jordan, Hogerty and JHP Management had knowledge of Ultra Solutions and GMI's use of the passcodes/keys, and while they had the right and ability to stop such use, they failed to stop the use of the passcodes/keys and agreed to permit their continued use because they profited from Ultra Solutions, GMI and Jordan Health Products' use and distribution of the generated passcodes/keys to deceive Philips' security. By using the passcodes/keys to commit fraud and agreeing to their use, Defendants conduct was willful, wanton and reckless.

153. On information and belief, as detailed further above and incorporated herein by reference, Jordan and Hogerty, prior to acquiring Ultra Solutions and GMI had knowledge of the unlawful methods and hacking tools used by Ultra Solutions and GMI and were aware of the continued use of those methods and tools post-acquisition, including for years after the GMI Litigation began.

154. Philips has been damaged by the conduct of Defendants in an amount not presently known with certainty, but that will be proven at trial. Defendants' conduct was willful, malicious, or demonstrated a wanton disregard for Philips rights, including because the unlawful conduct continued even after litigation was commenced. Accordingly, Defendants are also liable for punitive damages in an amount that is not presently known with certainty, but that will be proven at trial.

## **Count IV: Unfair Competition**
## **(All Defendants)**

155. Philips restates and re-alleges all of the allegations of all the paragraphs in this complaint as though fully set forth herein this Count V.

156. Philips' ability to attract and retain customers for repair and maintenance of its products depending on the continued security and integrity, and the proprietary features of Philips systems and Philips' proprietary software.

157. When entering into contracts with hospitals and health care providers, or other third party service providers, for the repair and maintenance of Philips systems, including ultrasound and Image Guided Therapy systems, Defendants, by relying on and profiting from their improper and unauthorized access of Philips' proprietary software, including Philips CSIP and access to unlicensed clinical software, misrepresent their rights to access/use such proprietary information and therefore, their expertise and capabilities to service Philips ultrasound systems. Through such conduct, Defendants have gained an improper competitive advantage over Philips that, *inter alia*, caused or may cause Philips to be underbid or to otherwise lose out on business that it would have otherwise obtained.

158. Relatedly, Defendants' actions have provided Defendants with competitive advantages with respect to the services that Defendants are able to offer and the pricing associated with those services, including the use of keys to induce GMI and Avante customers to breach their Agreements with Philips and to make unauthorized use of Philips proprietary software. These are advantages that Defendants would not have had but for Defendants' improper conduct in accessing and using Philips proprietary software beyond the degree authorized.

159. As such, Defendants have engaged in unfair competition. As a result of Defendants' unfair competition, Philips has suffered damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff requests that this Court enter judgment in its favor and against Defendants as follows:

1. Judgment be entered that:

   a. Defendants are vicariously liable for GMI, Transtate, Jordan Health Products and any Jordan Health Products' operating entities' actions of circumventing a technological measure that effectively controls access to Philips' works protected under Title 17 in violation of the DMCA, 17 U.S.C. § 1201(a)(1);

   b. Defendants are vicariously liable for GMI, Transtate, Jordan Health Products and any Jordan Health Products' operating entities' actions of trafficking in a technology, device, product, service, component, or part thereof in violation of the DCMA, 17 U.S.C. § 1201(a)(2);

   c. Defendants are vicariously liable for GMI, Transtate, Jordan Health Products and any Jordan Health Products' operating entities' falsification and provision or distribution of falsified copyright management information in violation of the DMCA, 17 U.S.C. § 1202; and

   d. Defendants are liable for fraud, conspiracy to commit fraud and engage in unfair competition.

2. Defendants be held liable and ordered to account for and pay to Plaintiffs,

   a. Statutory damages;

   b. disgorgement of all gains, benefits, and advantages;

   c. all losses and damages, including lost profits, lost license fees and costs for corrective actions, suffered by the Philips;

   d. Philips' reasonable attorneys' fees and costs pursuant to 17 U.S.C. § 505; and

   e. exemplary and punitive damages for Defendants' willful, wanton and reckless conduct.

3. Judgment granting Plaintiffs damages and such other relief as this Court deems just and proper.

DATED: October 12, 2026

By: /s/ James T. Hultquist
James T. Hultquist (6204320)
REED SMITH LLP
10 South Wacker Drive, 40th Floor
Chicago, Illinois 60606
Tel: (312) 207-1000
Fax: (312) 207-6400
Email: jhultquist@reedsmith.com

Gerard M. Donovan
DC Bar No. 997156 (*pro hac vice* forthcoming)
REED SMITH LLP
1301 K Street, N.W., Suite 1000 – East Tower
Washington, DC 20005
Tel: (202) 414-9224
Fax: (202) 414-9299
Email: gdonovan@reedsmith.com

Carla M. Wirtschafter
CA Bar No. 292142 (*pro hac vice* forthcoming)
REED SMITH LLP
1901 Avenue of the Stars, Suite 700
Los Angeles, California 90067
Tel: (310) 734-5200
Fax: (310) 734-5299
Email: cwirtschafter@reedsmith.com

*Attorney for Plaintiffs*
*Koninklijke Philips N.V., Philips North America LLC, and Philips India Ltd.*

**JURY DEMAND**

Philips hereby requests a jury trial on all issues and claims contained herein that are eligible for trial by jury.

DATED: October 12, 2026

By: */s/ James T. Hultquist*
James T. Hultquist (6204320)
REED SMITH LLP
10 South Wacker Drive, 40th Floor
Chicago, Illinois 60606
Tel: (312) 207-1000
Fax: (312) 207-6400
Email: jhultquist@reedsmith.com

Gerard M. Donovan
DC Bar No. 997156 (*pro hac vice* forthcoming)
REED SMITH LLP
1301 K Street, N.W., Suite 1000 – East Tower
Washington, DC 20005
Tel: (202) 414-9224
Fax: (202) 414-9299
Email: gdonovan@reedsmith.com

Carla M. Wirtschafter
CA Bar No. 292142 (*pro hac vice* forthcoming)
REED SMITH LLP
1901 Avenue of the Stars, Suite 700
Los Angeles, California 90067
Tel: (310) 734-5200
Fax: (310) 734-5299
Email: cwirtschafter@reedsmith.com

*Attorney for Plaintiffs*
*Koninklijke Philips N.V., Philips North America LLC, and Philips India Ltd.*